UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| HANOVER ARCHITECTURE SERVICE, P.A., <br><br> Plaintiff, <br><br> v. <br><br> CHRISTIAN TESTIMONY-MORRIS, N.P., et al., <br><br> Defendants. | Civ. No. 10-5455 (KM) <br><br> **O P I N I O N** |

*Appearances by:*

MARSHALL, DENNEHEY, WARNER, COLEMAN, & GOGGIN
By:   John G. O'Brien, Esq.
      Wendy H. Smith, Esq.
425 Eagle Rock Avenue, Suite 302
Roseland, New Jersey 07068

   *Attorneys for Plaintiff*

FOLEY & LARDNER LLP
By:   Jonathan E. Moskin, Esq.
      Anne B. Sekel, Esq.
      Alicia Pitts, Esq.
90 Park Avenue
New York, New York 10016

   *Attorneys for Defendants*

**DEBEVOISE, Senior District Judge**

This matter arises out of a breakdown in the business relationship between Plaintiff Hanover Architecture Service, P.A. ("Hanover") and Defendant Christian Testimony-Morris, N.P. ("Christian Testimony"), where Hanover was providing architectural design services to Christian Testimony for construction of a church facility. On October 21, 2010, Hanover filed a Complaint against Defendants Christian Testimony; Visbeen Construction Co. D.P.; Peter Raymond Wells, Architect, LLC; Reiner Group, Inc.; Energy Saving and Electrical Corp., Inc.; James Chang; Kenneth Visbeen; Peter Raymond Wells; and Jinfar Liu, setting forth causes of action for copyright infringement and conspiracy to commit copyright infringement under 17 U.S.C. § 101 et seq.; removal/alteration of copyright management information and conspiracy to commit removal/alteration of copyright management information under 17 U.S.C. § 1202(b) et seq.; providing false copyright management information and conspiracy to provide false copyright management information under 17 U.S.C. § 1202(a) et seq.; fraudulent inducement of contractual relations; negligent misrepresentation; and unfair competition under N.J.S.A. 46:1-4. The Complaint seeks declaratory judgment, an accounting of profits, injunctive relief, statutory damages, actual damages, compensatory damages, punitive damages, treble damages, interest, costs, and attorneys' fees.

On January 18, 2011, Defendants moved to dismiss the Complaint. Hanover opposed the motion. On March 28, 2011, Hanover filed an Amended Complaint setting forth the same causes of action as those in the original Complaint. On November 29, 2011, this Court issued an Opinion and Order, on the Amended Complaint, granting Defendants' Motion to Dismiss with respect to Plaintiff's fraud claim, but denying the motion with respect to Plaintiff's other claims.

On December 28, 2011, Defendants filed an answer to the Amended Complaint, along with counterclaims for breach of contract, declaratory judgment, and cancellation of certain

copyright registrations. Hanover now moves for summary judgment against Christian Testimony on its counterclaim for breach of contract. For the reasons set forth below, Hanover's motion is GRANTED in part and DENIED in part.

## I. BACKGROUND

Hanover is an architectural firm led by Chiming Liou. Christian Testimony is a born-again Christian church. In January 2005, James Chang, the president of Christian-Testimony, contacted Hanover to evaluate whether a certain warehouse in Boonton, New Jersey, could be reconstructed into a church ("the Conversion Project"). On March 13, 2005, after multiple telephone and in-person conversations, Hanover and Christian-Testimony entered into an agreement ("the First Agreement") under which Hanover would provide a review of the existing building plans and architectural design services of the warehouse for the purpose of obtaining a variance from the Township of Parsippany Building & Construction Office ("the Township"). The parties understood that the Conversion Project would include a main entrance, a vestibule and lobby, Chinese and English sanctuaries, a cry room and audiovisual room next to the Chinese Sanctuary, a cafeteria and kitchenette, classrooms, fellowship rooms, a children's worship room, five existing offices, a library, and restrooms meeting plumbing code requirements. In addition, prior to entering into the First Agreement, Christian Testimony made clear to Hanover, and Hanover acknowledged, that Christian Testimony's total budget for the Conversion Project, including construction, was $1 million.

According to Hanover, between March 13, 2005 and September 20, 2005, Mr. Chang informed Hanover on multiple occasions that Christian Testimony planned on retaining Hanover as the construction administrator for the Conversion Project, subject to the successful outcome of the aforementioned variance application. Mr. Chang further informed Hanover that Christian

Testimony was, at the time, experiencing financial hardship. Hanover told Christian Testimony that the church was not obligated to hire Hanover as the construction administrator.

On September 20, 2005, the parties entered into a second agreement, under which Hanover agreed to provide architectural drawings for the Conversion Project that complied with building code requirements ("the Second Agreement"). Specifically, under the Second Agreement, Hanover was required "to prepare architectural and construction drawings that would include electrical design, plumbing design, fire protection layout, meetings to finalize the designs, ten blueprints for construction and two for building permits, as well as modifications required by the building department to comply with building code requirements during the permit application." (Defs' Compl. ¶ 273.) According to Hanover, at this time, Mr. Chang again informed Mr. Liou that Christian Testimony intended to retain Hanover as the construction administrator of the Conversion Project, subject to the successful outcome of the variance application.

Christian Testimony maintains that Hanover breached the Second Agreement because Hanover "only provided the basic building design of lighting fixtures (not the entire electrical system design). As a result, Christian Testimony was required to retain and pay other professionals for their design services for 1) the electrical design (other than the switches and the receptacles); 2) the plumbing design (other than the plumbing fixtures and riser diagram); and 3) the fire protection and automatic sprinkler system (other than some modifications to the sprinkler system layout)." (Id. ¶ 275.) Christian Testimony nonetheless paid in full for all services rendered under the Second Agreement.

On October 19, 2006, after the Township granted a variance to Christian Testimony, Hanover and Christian Testimony entered into a third agreement, under which Hanover would

4

provide additional architectural drawings meeting building code requirements during the permit application process ("the Third Agreement"). However, according to Christian Testimony, Hanover did not provide "the electrical design and plumbing design and sprinkler system and fire alarm systems." (Id. ¶ 285.) Moreover, "Hanover failed to carry out its duties under the agreement in a professional manner." (Id. ¶ 286.)

Specifically, "Hanover incorrectly classified the building under relevant building codes, thus requiring the addition of a firewall that was not included in the plans as originally prepared by Hanover and which would have required substantial additional cost to Christian Testimony." (Id. ¶ 286a.) Moreover, when Christian Testimony discovered that "no firewall should have been required, Hanover refused to cooperate with the Parsippany Building Department to correct its own mistake and insisted instead to Christian Testimony that it needed to build the firewall, as a result of which progress on the project was delayed for many months and at considerable additional cost." (Id.) In addition, Hanover was required to revise the plans three times, because it failed to meet the requirements of the Parsippany Building Department, as a result of which, progress on the project was delayed for many months and at considerable additional cost." (Id. ¶ 286b.)

And, "[d]espite having agreed upon a budget before entering the agreements with Hanover, Hanover included in its design drawings certain features (in particular a large decorative arch and clerestory) that would have added to the budget in excess of $3.5 million." (Id. ¶ 286c.) "When Christian Testimony explained that such features were beyond its budget and requested that Hanover cut back on the design, Hanover refused to modify the drawings it had prepared and refused to continue performing under the agreements." (Id.) Finally, "[d]espite the fact that the parties' agreements never provided for Hanover to be construction

5

administrator, Hanover further refused to continue performing under the agreements unless Christian Testimony acceded to its demands to be appointed construction administrator." (Id. ¶ 286d.)

According to Christian Testimony, "Hanover's refusal to modify its designs to come within the scope of the budget originally contemplated was in violation of AIA Rule B141-1997, which provides (as part of the standard form agreement between owner and architect) that 'if the lowest bid or negotiated proposal exceeds the Owner's adjusted budget for the Cost of the Work, the Architect is obligated to modify the documents to comply with the owner's budget at no cost to the Owner.'" (Id. ¶ 287.) And "[d]espite Hanover's refusal to perform as required under the agreements it created, Christian Testimony paid Hanover in full in the amount of $10,200 for its services rendered under the October 19, 2006 agreement, plus additional costs for overtime." (Id. ¶ 288.)

On December 12, 2006, Hanover completed the variance design work under the First Agreement. On June 7, 2007, Hanover delivered preliminary designs to Christian Testimony as part of the building permit application to be filed with the Township. Shortly thereafter, Mr. Chang informed Hanover that Christian Testimony "had overturned its decision to retain Hanover to administer the building of the Conversion Project." (Amend. Compl. ¶ 39.) According to Mr. Chang, Christian Testimony decided to request bids from general contractors because it was concerned about rising costs in working with Hanover. (Chang Decl. ¶ 6.) Hanover was invited to submit its own bid, but ultimately refused to do so. See (id. ¶¶ 6, 7.)

On August 15, 2007, Hanover sent Christian Testimony an email stating that "[a]fter the construction contract is awarded, no services will be provided unless a signed construction contract is in place. The fee for construction administration is 5% of general contractor's

6

contract sum plus additional and change orders. No services based on the hourly charge are to be provided after the construction contract is awarded. Note that the service of construction administration is optional." (Defs' Compl. ¶ 296.)

On September 5, 2007, Hanover sent a letter to Mr. Chang stating, among other things, that its architectural designs in furtherance of the Conversion Project were protected by copyright and may not be used or modified without permission and payment of a licensing fee. Two days after this letter, Hanover filed three copyright applications, each entitled "Proposed Reconstruction Project of Christian Testimony Morris." (Id. ¶ 307.) Each application "identified Chiming Liou as the sole author of the Proposed Reconstruction Project of Christian Testimony Morris." (Id. ¶¶308-310.) According to Christian Testimony, Hanover's "failure to identify Christian Testimony as the creator of the original drawing or as a contributor or collaborator in the creation of the drawings was done deliberately to mislead the Copyright Office and claim exclusive rights in the works that were derived from the drawings of Christian Testimony and created jointly with the collaboration of Christian Testimony." (Id. ¶ 312.) Christian Testimony further claims that Hanover's three copyright applications were "filed deliberately to manufacture evidence to support a claim against Christian Testimony." (Id. ¶ 314.)

On September 19, 2007, Hanover sent a letter to Christian Testimony expressing, among other things, dismay at the state of their relationship. According to the letter, since 2005, Hanover had been informed many times that Christian Testimony formally decided to hire the firm to "perform the management services during construction" of the Conversion Project. (Amend. Compl., Ex. 14.) Relying on this information, Hanover "turned down some projects before June in order to focus on the coming church construction." (Id.)

7

And even after Christian Testimony's reversal of its decision to retain Hanover as a construction administrator, Hanover was told that Christian Testimony "had not made any decision whether to hire [a] P.M. or G.C. to deliver the construction" even though it had been looking for a general contractor since June. (Id.) Hanover found this statement "misleading" and "led [the] firm in the wrong direction."[1] (Id.) Therefore, "in order to prevent further damages," Hanover decided not to provide any further services to Christian Testimony, except those related to building code compliance during the permit application for the Conversion Project. (Id.)

The letter further states that Hanover was having difficulty honoring Christian Testimony's request to make modifications to the main sanctuary in order to reduce costs. Hanover felt that the design modifications requested by the general contractor "will transform the main sanctuary into a space without any meanings. I don't want such a design created by a G.C. and some of you to bear my name and damage my reputation of creativity. This is the reason that I won't provide service for the design revisions related to cost reduction." (Id.)

Finally, the letter reiterates that Hanover's "design and drawings are protected by Federal Copyright law. When your church hires other architect and engineers including the two in-house engineers of your G.C., please remind them to contact me to obtain my written permissions to use my design and drawings. This will prevent any unnecessary lawsuits of copyright infringement." (Id.)

Christian Testimony maintains that Hanover's refusal to modify the designs for the Conversion Project amounts to a breach of contract, and, as a result, Christian Testimony had to "hire a second architect to create new drawings to reduce the projected construction costs by

---

[1] At the time of the September 19, 2007 letter, Hanover was still being told that Christian Testimony "had not decided whether a CA service is necessary." (Amend. Compl., Ex. 14.)

more than $1.0 million (from $3.5 to $2.4 million), which was still well in excess of the originally agreed budget and required Christian Testimony to obtain substantial additional mortgage financing." (Id. ¶ 297.) In addition, the Conversion Project was "needlessly delayed, and Christian Testimony was required to lease alternative space at a cost of more than $135,000." (Id. ¶ 298.)

On December 26, 2007, Hanover delivered a copy of its designs of the Conversion Project to Christian Testimony. These copies incorporated changes requested by the Township during its first-level review. On March 12, 2008, Hanover provided a copy of its designs of the Conversion Project that incorporated changes requested by the Township during its second-level review. On March 22, 2008, Hanover provided a copy of its designs of the Conversion Project that incorporated changes requested by the Township during its third-level review.

On April 23, 2008, Paul E. Rusen, Esq., counsel to Christian Testimony, sent a letter to Hanover stating that the Township issued construction permits for the Conversion Project, on April 21, 2008, and that therefore Hanover's "obligation to render architectural services to Christian Testimony has concluded." (Amend. Compl., Ex. 15.) The letter further states that Christian Testimony intended to (1) employ Peter Raymond Wells as construction administrator; and (2) use the plans prepared by Hanover and other architects, over which Christian Testimony has exclusive rights to use in furtherance of the Conversion Project.

On June 20, 2008, Mr. Rusen sent another letter to Hanover. According to the letter, Christian Testimony had recently learned that the April 21, 2008 construction permit issued by the Township "was a contingent construction permit which merely permitted demolition of the premises." (Id., Ex. 16.) Moreover, the Township "refused to issue the balance of the construction permits based upon your design. As a result of the Township's decision, Christian

9

Testimony will not use your design for the renovation. Christian Testimony will retain an architect to redesign the renovation project."[2] (Id.)

On July 1, 2008, Mr. Rusen sent a third letter to Hanover. This letter stated that it had come to Christian Testimony's attention that Hanover had recently met with the Township regarding the Conversion Project, and reminded Hanover that (1) it is no longer providing architectural services to Christian Testimony; (2) Hanover is not allowed to discuss with or contact the Township on behalf of Christian Testimony regarding the Conversion Project; and (3) Christian Testimony had decided to terminate Hanover's services, redesign the Conversion Project, and paid Hanover in full for the services that it rendered. (Id., Ex. 17.)

According to Hanover, Christian Testimony completed the Conversion Project, between March 21, 2008 and September 2009, pursuant to designs that "were substantially similar" to those previously devised by Hanover. (Amend. Compl. ¶ 49.) Furthermore, according to Hanover, on April 12, 2010, Mr. Liou called Mr. Chang to inquire about the aforementioned permit process with the Township. During this conversation, Mr. Chang told Mr. Liou that Christian Testimony "did not redesign the Conversion Project." (Id. ¶ 53.)

## II. DISCUSSION

Hanover now moves for Summary Judgment, in its favor, on Christian Testimony's claim for breach of contract, pursuant to Federal Rule of Civil Procedure 56(a). In doing so, Hanover argues that (1) Christian Testimony's counterclaim for breach of contract should be dismissed because Christian Testimony failed to file and serve an affidavit of merit, pursuant to N.J.S.A. 2A:53A-27; (2) Christian Testimony's counterclaim for breach of contract is, in essence, one for

---

[2] According to Mr. Chang, the Township failed to issue a full construction permit, in part, because Hanover misclassified the building, thus requiring the Conversion Project to incorporate a fire wall. (Chang Decl. ¶ 17.)

10

professional negligence and therefore must be dismissed for failure to file and serve an affidavit of merit; and (3) dismissing Christian Testimony's counterclaim for breach of contract would be consistent with the public policy underlying the affidavit of merit statute.

Defendants counter that Hanover's motion should be denied because (1) only contract-related damages are alleged in support of Christian Testimony's claim for breach of contract; (2) no malpractice is at issue; and (3) Hanover defaulted on providing discovery on the factual issues it raises, in accordance with Federal Rule of Civil Procedure 56(d).

**A.      Standard of Review**

Summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). For an issue to be genuine, there must be "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party." Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006). For a fact to be material, it must have the ability to "affect the outcome of the suit under governing law." Id. Disputes over irrelevant or unnecessary facts will not preclude granting summary judgment.

The party moving for summary judgment has the burden of showing that no genuine dispute of material fact exists. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). When the moving party does not bear the burden of proof at trial, it may discharge its burden under the summary judgment standard by showing that there is an absence of evidence to support the non-moving party's case. Id. at 325. If the moving party can make such a showing, then the burden shifts to the non-moving party to present evidence that a genuine factual dispute exists and a trial is necessary. Id. at 324. In meeting its burden, the non-moving party must offer specific facts

that establish a material dispute, not simply create "some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). In deciding whether a dispute of material fact exists, the Court must consider all facts and their reasonable inferences in the light most favorable to the non-moving party. See Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995). The Court's function, however, is not to weigh the evidence and rule on the truth of the matter, but rather to determine whether there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). If there are no issues that require a trial, then judgment as a matter of law is appropriate. Id. at 251-52.

**B.     Christian Testimony's Counterclaim for Breach of Contract**

Hanover argues that Christian Testimony's counterclaim for breach of contract is, as a matter of law, one for professional malpractice. Therefore, according to Hanover, Christian Testimony was required to file and serve an affidavit of merit in support of that claim. And because it failed to do, Christian Testimony's counterclaim for breach of contract should be dismissed. Defendants argue that Christian Testimony's counterclaim for breach of contract is simply one for breach of contract and therefore does not require an affidavit of merit.

The Affidavit of Merit Statute provides that:

> In any action for damages for personal injuries, wrongful death or property damage resulting from an alleged act of malpractice or negligence by a licensed person in his profession or occupation, the plaintiff shall, within 60 days following the date of filing of the answer to the complaint by the defendant, provide each defendant with an affidavit of an appropriate licensed person that there exists a reasonable probability that the care, skill or knowledge exercised or exhibited in the treatment, practice or work that is the subject of the complaint, fell outside acceptable professional or occupational standards or treatment practices. The court may grant no more than one additional period, not to exceed 60 days, to file the affidavit pursuant to this section, upon a finding of good cause.

N.J.S.A. 2A:53A-27.

A "licensed person" is defined as a licensed accountant, architect, attorney, dentist, engineer, physician, podiatrist, chiropractor, registered nurse or health care facility. N.J.S.A. 2A:53A-26. In general, "failure to provide an affidavit results in dismissal of the complaint." Couri v. Gardner, 173 N.J. 328, 333 (2002). The "overall purpose of the statute is to require plaintiffs in malpractice cases to make a threshold showing that their claim is meritorious, in order that meritless lawsuits readily could be identified at an early stage of litigation." Id. (quotation omitted).

The New Jersey Supreme Court has held that "[t]here are three elements to consider when analyzing whether the [Affidavit of Merit] statute applies to a particular claim: (1) whether the action is for damages for personal injuries, wrongful death or property damage (nature of injury); (2) whether the action is for malpractice or negligence (cause of action); and (3) whether the care, skill or knowledge exercised or exhibited in the treatment, practice or work that is the subject of the complaint [ ] fell outside acceptable professional or occupational standards or treatment practices (standard of care)." Id. at 334 (quotations omitted).

### i. *Nature of Injury*

Defendants contend that Christian Testimony's claim for breach of contract fails to satisfy the nature of injury element because that claim does not allege damages for personal injury, wrongful death, or property damage. Hanover counters that this position "has not been accepted by the courts. It has been held that a claim for alleged professional malpractice is a claim for property damage within the legislative intent and plain . . . meaning of the statute." (Pl.'s Rep. Br. 5. (citation omitted)).

The precise definition of property damage under the Affidavit of Merit Statute is extremely difficult to discern under New Jersey case law. In Cornblatt v. Barow, the New Jersey

13

Appellate Division found that "[m]alpractice or negligence committed by architects, engineers, or attorneys may very well result in damage to real and personal property. Personal property embraces everything that may be tangible or intangible such as a chose in action. The right or claim to money damages . . . is a property right . . . beyond question." 303 N.J. Super. 81, 86 (App. Div. 1997) (quotation omitted), rev'd on other grounds by Cornblatt v. Barrow, 153 N.J. 218 (1998). The Appellate Division further held, in Charles A. Manganaro Consulting Eng'rs, Inc. v. Carneys Point Twp. Sewerage Authority, 344 N.J. Super. 343, 346-47 (App. Div. 2001), that "[b]y its plain terms, N.J.S.A. 2A:53A-27 applies only to a 'plaintiff' who files an 'action for damages' based on 'an alleged act of malpractice or negligence' by one of the categories of professionals listed in N.J.S.A. 2A:53A-26."

Shortly after Manganaro, the New Jersey Supreme Court addressed the applicability of the affidavit of merit statute in Couri. In that case, the plaintiff retained a licensed psychiatrist as a potential expert witness in connection with his divorce proceeding. 173 N.J. at 331. After the psychiatrist disclosed his preliminary findings without the plaintiff's permission, the plaintiff filed a breach of contract action alleging that the psychiatrist was retained to prepare a report only for the plaintiff. Id.

Initially, the plaintiff requested compensatory and punitive damages. Id. at 334-35. However, at oral argument, the plaintiff narrowed his request for damages to the $12,000 that he paid to the defendant for the report and any incidental costs incurred in the matrimonial action resulting from the necessity of filing motions based on the defendant's dissemination of the report. Id. at 335. According to the court, these "are neither damages for personal injuries, wrongful death or property damage." Id. at 335 (quotation marks omitted). The court therefore

14

concluded that the alleged damages were outside the scope of the affidavit of merit statute. Id. However, the court failed to define in any way the contours of property damage under the statute.

One year after Couri, the New Jersey Superior Court issued a decision in Nagim v. New Jersey Transit, 369 N.J. Super. 103 (Law Div. 2003) that attempted to clarify Couri's ruling on the scope of property damage under the affidavit of merit statute. In doing so, the Nagim court found that the damages alleged in Couri were "limited solely to the compensatory damage associated with the costs that the plaintiff paid to the defendant for the furnishing of the report." Nagim, 369 N.J. Super. at 119. "That injury thus became a finite sum of money already paid by the plaintiff to the defendant and for which recompense was sought." Id. In contrast, injuries for "yet unspecified" costs associated with one or more claims fall within the scope of property damage under the affidavit of merit statute. Id.

The Court fails to understand how this distinction clarifies the meaning of property damage under the Affidavit of Merit Statute. Indeed, the Court of Appeals encountered similar confusion in Nuveen Mun. Trust ex rel. Nuveen High Yield Mun. Bond Fund v. WithumSmith Brown, P.C., 692 F.3d 283, 311-12 (3d Cir. 2012), when attempting to discern the scope of property damage under the statute. Thus, the Court of Appeals certified "to the New Jersey Supreme Court a question regarding the scope of the 'nature of the injuries' element of the Statute." Id. Unfortunately, the New Jersey Supreme Court denied the Court of Appeals' certification of that question, see Nuveen Municipal Trust v. Withumsmith Brown, P.C., 213 N.J. 527, 528 (2013), and the Court of Appeals has yet to address the issue since then.

Therefore, while the definition of damages to personal property contemplated in the Affidavit of Merit Statute remains nebulous, Couri makes clear that amounts paid under a contract, or amounts paid as a result of the breach of the contract, do not fall within the ambit of

15

the statute. Here, the bulk of damages alleged by Christian Testimony, pursuant to its counterclaim for breach of the Second and Third Agreements,[3] falls outside the scope of damages to personal property under the Affidavit of Merit Statute. These damage include (1) the amounts paid to Hanover under those agreements; (2) retaining and paying other architects to provide designs for certain aspects of the Conversion Project that Hanover was obligated to provide under the Second and Third Agreements, but failed to do so; (3) leasing of alternative space; and (4) retaining and paying another architect to create new designs to reduce construction costs of the Conversion Project, which were still in excess of the original budget to which Hanover and Christian Testimony agreed.

Like Couri, these damages include amounts paid to Hanover under the Second and Third Agreements, and amounts paid as a result of Hanover's breach of those agreements. Thus, these damages fail to satisfy the nature of injury element of the Affidavit of Merit Statute. However, unlike Couri, Christian Testimony also seeks damages for delay in the Conversion Project. Because the damages for the delay itself are separate and apart from amounts paid arising out of Hanover's breach of the Second and Third Agreements, those damages satisfy the nature of injury element.

### ii. *Cause of Action and Standard of Care*

Hanover argues that Christian Testimony's counterclaim for breach of contract satisfies the cause of action and standard of care elements because it contains allegations that suggest professional malpractice and deviation from the professional standard of care applicable to architects. Defendants argue that Hanover fails to satisfy these elements because there is no

---

[3] There is no clear indication in Christian Testimony's counterclaim for breach of contract that Hanover breached the First Agreement.

16

malpractice or deviation from a professional standard of care at issue in Christian Testimony's counterclaim for breach of contract.

To determine whether a claim asserted against a professional satisfies the cause of action and standard of care elements, "rather than focusing on whether the claim is denominated as tort or contract, attorneys and courts should determine if the claim's underlying factual allegations require proof of a deviation from the professional standard of care applicable to that specific profession." Couri, 173 N.J. at 340.

Christian Testimony claims that Hanover breached the Second Agreement by providing incomplete electrical, plumbing, and fire protection designs. This claim does not require proof of a deviation of the professional standard of care applicable to architects. To the contrary, it requires proof of (1) the terms of the Second Agreement to ascertain the electrical, plumbing, and fire protection designs that Hanover promised to provide; and (2) the electrical, plumbing, and fire protection designs that Hanover in fact provided. Consequently, Christian Testimony's claim for breach of contract, as it relates to the Second Agreement, does not satisfy the cause of action or standard of care elements.

Christian Testimony alleges that Hanover breached the Third Agreement by (1) having to revise its designs three times before they met the Township's requirements; (2) exceeding the budget that was agreed to and refusing to modify designs to reduce costs, in violation of AIA Rule B141-1997; (3) misclassifying the building and refusing to reclassify it; (4) failing to provide the electrical, fire, and plumbing designs; and (5) refusing to continue to provide architectural services for the Conversion Project unless Christian Testimony designated Hanover as the construction administrator.

17

The second, fourth, and fifth allegations do not require proof of a deviation from the professional standard of care applicable to architects. The second allegation requires proof (1) of an agreement to a particular budget; (2) that that agreement was a part of the Third Agreement; (3) that projected budget based on Hanover's designs exceeded the budget that was agreed to; and (4) that Hanover refused to provide architectural designs within the scope of the budget agreement.[4] The fourth allegation requires proof that (1) the Third Agreement required Hanover to provide specific electrical, fire, and plumbing designs; and (2) Hanover failed to provide those designs. And the fifth allegation requires proof that (1) the Third Agreement did not require Christian Testimony to designate Hanover as the construction administrator for the Conversion Project; and (2) Hanover refused to perform under the Third Agreement because it was not designated as the construction administrator for the Conversion Project.

In contrast, the first and third allegations in support of Christian Testimony's claim that Hanover breached the Third Agreement are indicative of malpractice and require proof of a deviation from the professional standard of care applicable to architects. With respect to the first allegation—that Hanover was required to revise its designs three times before they met the Township's requirements—there is no indication that the Third Agreement required Hanover to provide designs that meet the Township's requirements, without revision. Therefore, that allegation does not suggest a breach of a contractual duty, but rather a professional one.

---

[4] To the extent Christian Testimony wishes to set forth a violation of a provision, pursuant to AIA model contract B-141-1997, requiring Hanover to modify its designs if those designs indicate a budget in excess of that originally contemplated by Christian Testimony, there must be proof (1) that the Third Agreement contained such a provision in accordance with AIA model contract B-141-1997; (2) of the original budget contemplated; (3) that Hanover's designs indicated a budget in excess of what was originally contemplated; and (4) that Hanover refused to modify those designs to accord with the original budget.

18

Similarly, there is nothing in the Third Agreement requiring Hanover to classify the building to house the Conversion Project according to Christian Testimony's specifications. Thus, the allegation that Hanover misclassified the building and refused to reclassify it at Christian Testimony's request does not serve as a basis for a claim for breach of contract, but rather one for malpractice.

Thus, Christian Testimony's allegations that Hanover (1) provided designs that required several revisions before meeting the Township's requirements; and (2) misclassified the building to house the Conversion Project and refused to reclassify it satisfy the cause of action and standard of care elements. Moreover, the damages alleged to have resulted from these acts of malpractice amount to delay in the Conversion Project, which the Court previously found to satisfy the nature of injury element.[5] Consequently, Christian Testimony's claim for breach of contract, as that claim relates to allegations that Hanover (1) provided designs that required several revisions before meeting the Township's requirements; and (2) misclassified the building to house the Conversion Project and refused to reclassify it, required an affidavit of merit in support.[6] Because it is undisputed that Christian Testimony failed to provide an affidavit of

---

[5] To be sure, the alleged damages of having to lease alternative space as a result of the delay in the Conversion Project do not satisfy the nature of injury element.

[6] In follow up submissions, Hanover points out that Christian Testimony retained an expert in support of its counterclaim. Christian Testimony admits that it retained an expert for the following three purposes. First, the expert will help prove that Hanover was not entitled to disregard Christian Testimony's request to make cost-saving alterations in its designs. In doing so, the expert notes that (1) an architect is not free to disregard its client's wishes; (2) disregarding Christian Testimony's request amounted to denial of "an essential service;" and (3) engaging in "extractive maneuvers" to "quit the project" in violation of the American Institute of Architect's Code of Ethics and Professional Conduct. (ECF No. 94.) Second, the expert will show that "it is customary for an architect to establish an initial budget in the preliminary design phase and the architect is obligated to adjust the budget as need be in the construction document design phase." (Id.) Third, the expert will help respond to Hanover's theory that it need only have performed under the Agreements at a certain standard rate charged by architects by

merit in support of its claim for breach of contract, that claim, as it relates to those allegations, is dismissed with prejudice.

### III. CONCLUSION

For the foregoing reasons, Hanover's Motion for Summary Judgment is GRANTED on Christian Testimony's counterclaim for breach of contract, as it relates to Christian Testimony's allegations that Hanover (1) provided designs that required several revisions before meeting the Township's requirements; and (2) misclassified the building to house the Conversion Project and refused to reclassify it, but DENIED in all other respects. Christian Testimony's counterclaim for breach of contract, only as it relates to those allegations, is dismissed with prejudice.

The Court will enter an order implementing this opinion.

　　　　　　　　　　　　　　　　　　 **/s/ Dickinson R. Debevoise**　　　　　　
　　　　　　　　　　　　　　　　　　DICKINSON R. DEBEVOISE, U.S.S.D.J.

Dated: January 24, 2014

---

showing that (1) it is unlawful for architects to share rate information; and (2) there is no industry standard of compensation for architectural services.

　　The first two purposes directly support Christian Testimony's allegation that Hanover breached the Third Agreement by exceeding the budget that was agreed to and refusing to modify designs to reduce costs. To the extent this allegation is not based on the terms of the Third Agreement, but rather on professional standards requiring architects to (1) not disregard a client's wishes or deny a client an essential service; (2) not engage in unethical behavior to get out of a project; or (3) establish a budget and adjust it as needed, it is a claim for malpractice that would require an affidavit of merit if it used to support Christian Testimony's claim for damages from the delay in the Conversion Project. The third purpose, however, does not create a malpractice issue because the evidence will be used only to rebut Hanover's theory that it was not bound by the Agreements with Christian Testimony.