## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **HANOVER ARCHITECTURAL SERVICE, P.A.,**<br><br>          **Plaintiff,**<br><br>     **v.**<br><br>**CHRISTIAN TESTIMONY-MORRIS, N.P., et al.,**<br><br>          **Defendants.** | Civ. No. 2:10-5455<br><br>(KM)(SCM)<br><br><br>**OPINION** |

**KEVIN MCNULTY, U.S.D.J.:**

This is a contract dispute between architect and client, in which the architect also claims infringement of copyright. The plaintiff, Hanover Architectural Service, P.A. ("Hanover"), entered into three contracts with defendant Christian Testimony-Morris, N.P. ("Christian Testimony"). These contracts required Hanover to provide architectural design services for a "Conversion Project" at Christian Testimony's new church facility. Christian Testimony claims that Hanover breached the contracts in numerous ways, for example by refusing to accommodate Christian Testimony's design requests and by failing to obtain certain necessary construction permits for the Conversion Project. Finding Hanover's performance deficient, Christian Testimony hired a replacement architect. Hanover claims that Christian Testimony's new architect copied Hanover's copyrighted design plans.

Hanover is suing Defendants Christian Testimony; Visbeen Construction Co., D.P.; Peter Raymond Wells, Architect, LLC; Reiner

1

Group, Inc.; Energy Saving and Electrical Corp., Inc.; James Chang; Kenneth Visbeen; Peter Raymond Wells; Jinfar Liu; and John Does 1–10,[1] for copyright infringement and conspiracy to commit copyright infringement under 17 U.S.C. § 101 *et seq.*; removal/alternation of copyright management information and conspiracy to commit removal/alteration of copyright management information under 17 U.S.C. § 1202(b) *et seq.*; providing false copyright management information and conspiracy to provide false copyright management information under 17 U.S.C. § 1202(a) *et seq.*; and negligent misrepresentation. (*See* Amended Complaint, ECF No. 22.) Hanover seeks declaratory judgment, an accounting of profits, injunctive relief, statutory damages, actual damages, compensatory damages, punitive damages, treble damages, interest, costs, and attorneys' fees.

Christian Testimony counterclaims for breach of contract, a declaratory judgment, and cancellation of certain copyright registrations. (*See* Answer & Counterclaims, ECF No. 32.)

Now before the court are the following motions:

(1) Hanover's motion for partial summary judgment on Christian Testimony's first counterclaim for breach of contract (ECF No. 101, the "101 Motion");

(2) Hanover's motion for summary judgment on all of the claims in its amended complaint (ECF No. 116, the "116 Motion"); and

(3) Christian Testimony's cross-motion for summary judgment on all claims in Hanover's amended complaint, as well as Christian Testimony's counterclaim for breach of contract (ECF No. 124, the "124 Motion").

---

[1]      In general, the distinction between Christian Testimony and the individual defendants is immaterial to the legal issues on this motion. As the context requires, references to Christian Testimony may be read to encompass the individual defendants as well.

For the reasons set forth below, all motions for summary judgment are DENIED.

## I.     BACKGROUND

### A. Facts[2]

Plaintiff Hanover is a New Jersey corporation with a principal place of business in Morris Plains, New Jersey. (CT 124 Stmt. ¶3.)

Defendant Christian Testimony is a New Jersey non-profit corporation with a principal place of business in Boonton, New Jersey. (*Id.* ¶1.) It is a born-again Christian church with a congregation of about three hundred. (*Id.* ¶2.)

Defendant James Chang is a Brother of the church. (*Id.* ¶1.)

Defendant Chiming ("Jimmy") Liou, a New Jersey resident and an architect, is the principal owner of Hanover. (*Id.* ¶4.)

Defendant Visbeen Construction, Co., D.P. ("Visbeen Construction") was the general contracting firm involved with the Conversion Project. (*Id.* ¶5.) Kenneth Visbeen is its owner. (*Id.*)

Defendant Peter Raymond Wells Architect, LLC ("Wells Architect") is the architectural firm Christian Testimony hired after Hanover. (*Id.* ¶6.) Peter Raymond Wells is its principal. (*Id.*)

Defendant Reiner Group, Inc. ("Reiner Group") was hired by Christian Testimony to design the heating, ventilation, and air conditioning ("HVAC") system for the Conversion Project. (*Id.* ¶7.)

Defendant Energy Savings & Electrical Corp., Inc. ("ESEC") was hired by Christian Testimony to design the fire alarm system for the

---

[2]     The record is so voluminous that full record cites, with abbreviations defined in text, would be unworkable. Attached as an addendum to this opinion is a key to the record citation abbreviations used in text.

Conversion Project. (*Id.* ¶8.) Jinfar Liu is its principal. (*Id.*)

Christian Testimony and Hanover entered into three agreements requiring Hanover to provide architectural services for the Conversion Project. It is undisputed that Christian Testimony paid Hanover in full for all of the services Hanover performed under all of the agreements. (CT 124 Stmt. ¶¶45, 57, 80[3] (citing Chang Decl. ¶¶45, 56, 74); Han. 124 Resp. ¶¶45, 57.)

### a. First Agreement

On or about March 13, 2005, Christian Testimony entered into the first of the three agreements with Hanover ("First Agreement"), which required Hanover to provide architectural services for Christian Testimony's plan to modify its existing church facility. (CT 124 Stmt. ¶9; Han. 124 Resp. ¶9; Chang Decl. Ex. 1.) Christian Testimony states that the First Agreement was entered into for the purpose of obtaining a variance from the Township of Parsippany for the project. (CT 124 Stmt. ¶9.)

The First Agreement related to the remodeling of Christian Testimony's existing building at 42 Intervale Road, Parsippany, NJ. The remodeling was to include the following: a main entrance, vestibule and lobby; Chinese and English sanctuaries; three baby/toddler rooms adjacent to Chinese sanctuary; a cafeteria and kitchenette; additional large classrooms; Elder and English fellowship rooms; a children worship room; five offices; a library; and restrooms per the plumbing code requirements. (CT 124 Stmt. ¶11 (citing Chang Decl. ¶14, Ex. 1).)

---

3       Hanover generally "den[ies] the allegations of Paragraph 80" (Han. 124 Resp. ¶80), which reads: "Despite Hanover's refusal to perform as required under the agreements it created, Christian Testimony paid Hanover in full in the amount of $10,200 for its services rendered under the [Third Agreement], plus additional costs for overtime." (CT 124 Stmt. ¶80 (citing Chang Decl. ¶74).) Hanover does not allege or point to evidence, however,  that it was unpaid or underpaid. Hanover's dispute with paragraph 80 may therefore be limited to the first part of the statement, regarding its alleged "refusal to perform."

Hanover's responsibilities under the First Agreement included the following: reviewing existing building plans; creating an architectural design for the purpose of variance application; participating in three meetings to finalize the design; attending one public hearing; and producing twenty sets of blueprints for the purpose of the variance application. (Chang Decl. Ex. 1.)

Specifically excluded from Hanover's duties were the following: (1) "confirmation of zoning ordinances regarding use, setbacks, building coverage and height and etc."; (2) "variance application and attending public hearing unless otherwise noted"; (3) "measurement of existing building"; (4) "certification of existing structure and conditions"; (5) "construction drawings and details design"; (6) "engineering, parking lot, landscaping designs and grading plan"; (7) "estimation, contract administration, site visits, inspections and supervision." (*Id.* ("Services Not By Architect").)

Liou testified that Chang advised him, after the first official design for the project was completed, that the budget for Conversion Project was to be $1.2 million. (CT 124 Stmt. ¶13 (citing Liou Dep. 43:21–44:7; Han. 124 Resp. ¶13.)

Hanover's fee under the First Agreement was to be $7,000, plus $400 for each public hearing attended; $120 per hour spent making design changes requested by Christian Testimony or the Township of Parsippany; $120 per hour for any additional meetings; and $3 per sheet of additional blueprints (plus postage for delivery). (Chang Decl. Ex. 1.) The Agreement provided for the adjustment of service fees "if the scope of the proposed project changes during [the] design period." (*Id.*)

Christian Testimony created "the original drawing and existing layout for the project," as well as four other presentations for the layout, and gave copies to Hanover. (CT 124 Stmt. ¶¶15–17 (citing Chang Decl.

¶¶17–19, Ex. 5, 6).[4]) Hanover drafted another layout on March 29, 2005, which it sent to Christian Testimony. (*Id.* ¶18 (citing Chang Decl. ¶20, Ex. 7).)

Christian Testimony and Hanover then collaborated in the design process. (*Id.* ¶¶19–26 (citing Chang Decl. ¶21–31 (citing Ex. 8).) Christian Testimony proposed many changes to the designs, which were ultimately incorporated into the final layout. (*Id.*) The design was finalized on June 1, 2005. (*Id.* ¶28 (citing Chang Decl. ¶30, Ex. 9).)

### b. Second Agreement

On September 20, 2005, Christian Testimony and Hanover entered into a Second Agreement, prepared by Hanover. (Han. 116 Stmt. ¶19 (citing 2d Am. Liou Decl.[5] ¶19); Chang Decl. Ex. 2.) Christian Testimony says that the Second Agreement was signed "based on the assumption that the variance would be approved shortly." (CT 124 Stmt. ¶46 (citing Chang Decl. ¶46).)

The Second Agreement required Hanover (1) to provide architectural design and construction drawings for the building itself, the electrical fixtures, the plumbing, the fire protection layout; (2) to attend three meetings to finalize the designs (for a total of six hours); (3) to provide ten sets of blueprints for construction purposes, including two sets for the construction permits applications; and (4) to ensure that any modifications to the building comply with building code requirements during the permits application process. (Chang Decl. Ex. 2.)

The Second Agreement explicitly excluded from Hanover's duties

---

[4]   Hanover says it disputes this and certain other paragraphs, but does not cite to any evidence.

[5]   Hanover has submitted several declarations from Chiming "Jimmy" Liou in support of its moving papers. At times, Hanover is unclear about the particular declaration it is citing in its statements of facts, although I have tried to correlate them by content. The abbreviations used here for the various Liou declarations are contained in the Addendum, *infra*.

the following services: (1) "confirmation of zoning ordinances regarding use, setbacks, building coverage and height and etc."; (2) "variance application and attending public hearing"; (3) "construction permits application and fees incurred by any jurisdictional agencies or any fees incurred by owner hiring consultants"; (4) "certification of existing structure and conditions"; (5) "structural design"; (6) "electrical panels, load and wiring design"; (7) "mechanical and cooling/heating systems designs"; (8) "automatic sprinkler system design"; (9) "site engineering, parking lot, landscaping designs and grading plan"; (10) "kitchen and built-in cabinets detail designs"; and (11) "estimation, contract administration, site visits, inspections and supervision." (*Id.* ("Services Not By Architect").)

Hanover was to be paid $17,000, plus $120 per hour spent making design changes requested by Christian Testimony after the completion of design meetings; $120 per hour for any additional meetings; $150 per site visit requested by Christian Testimony or the contractors during the construction period (up to an hour); and $3 per sheet of additional blueprints (plus postage for delivery). (*Id.*) The Agreement provided for the adjustment of service fees "if the scope of the proposed project changes during [the] design period." (*Id.*)

Christian Testimony contends that the purpose of the Second Agreement was to enable Christian Testimony to obtain construction permits. That is why, it says, the Second Agreement explicitly required that any designs comply with building code requirements. (CT 124 Stmt. ¶55 (citing Chang Decl. ¶54, Ex. 2).)

Christian Testimony contends that Hanover did not complete its performance under the Second Agreement because (1) it "only provided the basic building design and design of lighting fixtures (not the entire electrical system design)"; (2) Hanover did not provide plumbing design, "other than plumbing fixtures and riser diagram"; and (3) Hanover did

7

not provide designs for fire protection and the automatic sprinkler system, "other than some modifications to the sprinkler system layout." (CT 124 Stmt. ¶56 (citing Chang Decl. ¶55).) Hanover maintains that (1) the Second Agreement "specifically excluded complete electrical design" and that designs of electrical panels, load and wiring design, and switches and receptacles "were subsequently removed from Hanover's scope of services following discussions with James Chang in 2007 as a result of redundancy with work being performed by the electrical engineer"; (2) the requirement to complete the plumbing designs "was subsequently deleted in exchange for the design of secondary sanctuary clerestory"; and (3) that the mechanical engineer on the project proposed a new wet pipe sprinkler system that rendered the provision of a fire protection layout (specifically, the modification of the existing automatic sprinkler system layout) unnecessary. (Han. 124 Resp. ¶56 (citing Liou Supp. Decl. ¶¶4, 19, 20).)

### c. *Third Agreement*

On or about October 19, 2006, The Township of Parsippany granted a variance, and Christian Testimony entered into the Third Agreement with Hanover. (CT 124 Stmt. ¶58 (citing Chang Decl. ¶57); Han. 116 Stmt. ¶21; Chang Decl. Ex. 3.)

Under the Third Agreement, Hanover was required (1) to provide architectural design and construction drawings for the building, the electrical fixtures, and the plumbing; (2) to attend two meetings to finalize the designs (four hours total); (3) to provide ten sets of blueprints for construction purposes, including two sets for the permits applications; and (4) to ensure that modifications comply with building code requirements during the permits application process. (Chang Decl. Ex. 3.)

The Third Agreement excluded the same duties as the Second

Agreement. (*See id.* ("Services Not By Architect").)

Hanover's fee under the Third Agreement was $10,200, plus $120 per hour spent making design changes requested by Christian Testimony after the completion of design meetings, $120 per hour for any additional meetings, $150 per site visit requested by Christian Testimony or the contractors during the construction period (up to an hour and prorated thereafter), and $3 per sheet of additional blueprints (plus postage for delivery). (*Id.*) The Agreement provided for an adjustment of service fees "if the scope of the proposed project changes during [the] design period." (*Id.*)

Christian Testimony states that in or about June 2007, Hanover estimated that construction costs for the project would be about $1.5 million. That figure, according to Christian Testimony, was 50% over the "original budget." (CT 124 Stmt. ¶66 (citing Chang Decl. ¶63).) Hanover denies ever agreeing to a particular budget. (Han. 124 Resp. ¶66 (citing Liou Supp. Decl. ¶21).) The Third Agreement does not mention a particular budget for the construction costs. (Chang Decl. Ex. 3.)

Christian Testimony says that because it was concerned about the estimated construction costs based on Hanover's designs, it solicited budget proposals from other general contractors. (CT 124 Stmt. ¶67 (citing Chang Decl. ¶63).) Other contractors estimated that construction costs would range from $3.5 to $4.2 million. (*Id.*) Hanover contends that these estimates included work that was specifically excluded from Hanover's design responsibilities. (Han. 124 Resp. ¶67.)

The Third Agreement requires Hanover to provide services for the permits applications, such as providing sets of blueprints and ensuring that any modifications comply with building code requirements, but it also specifically excludes "construction permits application and fees" from Hanover's responsibilities. (Chang Decl. Ex. 3.) Christian Testimony

interprets this language to mean that Hanover's responsibilities included obtaining construction permits from the Parsippany Township. (CT 124 Stmt. ¶69 (citing Chang Decl. ¶65).) Hanover disputes this, arguing that "permits applications were specifically excluded from [the] Agreements." (Han. 124 Stmt. ¶69 (citing Supp. Liou Decl. ¶¶23–24).)

Christian Testimony contends that "Hanover incorrectly classified the facility under the relevant building codes, . . . thus requiring the addition of a firewall that was not included in the plans as originally prepared by Hanover." The firewall, it says, would have greatly increased the cost of the project. (CT 124 Stmt. ¶¶70–71 (citing Wells Decl. ¶9; Chang Decl. ¶¶66–67; Visbeen Decl. ¶6).) According to Christian Testimony, Hanover refused to correct this mistake despite many meetings with the Parsippany Building Department, resulting in delay and increased costs. (*Id.* ¶72 (citing Chang Decl. ¶68; Visbeen Decl. ¶4).) Christian Testimony says Hanover was asked by the Parsippany Building Department to revise its design plans three times because the plans failed to meet the Building Department's requirements. (*Id.* ¶73 (citing Chang Decl. ¶69; Visbeen Decl. ¶4).)

Christian Testimony also accuses Hanover of refusing to accommodate its requests for design modifications to eliminate certain features that would have exceeded Christian Testimony's budget—in particular, a large decorative arch and clerestory. (CT 124 Stmt. ¶¶76–78 (citing Chang Decl. ¶¶72–73, Ex. 14).) Christian Testimony says Hanover refused to continue to perform its duties under the Third Agreement unless it was appointed construction administrator. (CT 124 Stmt. ¶79 (citing Chang Decl. ¶73, Ex. 14).) Christian Testimony cites a letter from Liou on September 19, 2007, in which he writes:

> Since the beginning of design stage in 2005 until early June this year, I had been informed many times that your church formally decided to hire my firm to perform the management services during construction. . . . At present time, I am told

> that your church has not decided whether or not a
> [construction administration] service is necessary. . . . In
> order to prevent further damages, I decided not to provide
> any services including [construction administration] to your
> church from now on except the building code compliance
> during permit application. . . . Regarding the design revisions
> related to cost reduction, I have had tough time to figure out
> how to modify the main sanctuary. I spend extra hours to
> design that beautiful space to glorify our Lord. The requests
> came out from the [general contractor] and some of you will
> transform the main sanctuary to a space without any
> meaning. I don't want such a design created by a [general
> contractor] and some of you to bear my name and damage
> my reputation of creativity. This is the reason that I won't
> provide service for the design revisions related to cost
> reduction.

(Chang Decl. Ex. 14.) Hanover disputes the authenticity of the email,
stating that certain words have been changed and others added. (Han.
124 Resp. ¶88.)

Christian Testimony calls Hanover's refusal to make design
modifications a breach of the agreements. (CT 124 Stmt. ¶¶89–90.)

### d. Construction permits

Christian Testimony says that Hanover's refusal to make design
modifications meant that Christian Testimony had to hire a second
architect, Peter Wells, to create new drawings to reduce the projected
construction costs by more than $1 million. (CT 124 Stmt. ¶94 (citing
Chang Decl. ¶83).) This resulted in a delay of one year before the
construction permits were issued. (Id. ¶95 (citing Chang Decl. ¶84; Wells
Decl. ¶9; Visbeen Decl. ¶6).) Christian Testimony clarifies that at the
time Wells was hired, the Parsippany Building Department had issued a
demolition permit, but not construction permits. (Id. ¶96 (citing Chang
Decl. ¶85, Ex. 17; Wells Decl. ¶¶3, 9; Visbeen Decl. ¶5).) Although the
permit (dated April 21, 2008) appears to be a construction permit (Chang
Decl. Ex. 17), Visbeen clarifies that the following indicates that the

permit was for demolition only: (1) on the "building subcode technical section," page, it states "THIS PROJECT HAS NOT BEEN APPROVED FOR ANY STRUCTURAL WORK," and "THIS PROJECT HAS NOT BEEN APPROVED FOR ANY HVAC WORK"; (2) the permit itself only has an "X" in the "building" box, which means mechanical work is not allowed; and (3) Christian Testimony only paid $300 for the permit, rather than the crossed-out original cost of $35,295. (Visbeen Decl. ¶5, Chang Decl. Ex. 17.)

Hanover's position is that the April 21, 2008 permit covered the portion of the project for which Hanover was responsible and permitted construction. (Han. 124 Resp. ¶95 (citing Tomiano Report).) Hanover says the structural and HVAC work was specifically excluded from Hanover's duties under the Agreements. (*Id.*) Hanover states that the permit specifically indicated that the Building Department accepted the "Architectural – A sheets," which were the drawings Hanover prepared, and "did not include demolition." (*Id.* ¶¶95–97 (citing Tomiano Report).)

### e. Discussions regarding construction administration

Christian Testimony and Hanover discussed the possibility of Hanover's being retained for the job of construction administrator as well. (CT 124 Stmt. ¶31 (citing Chang Decl. ¶33); Han. 124 Resp. ¶33.) Hanover claims that Christian Testimony made numerous promises between March 13, 2005 and September 20, 2005 to Hanover, and to Liou in particular, that it would retain Hanover as construction administrator if Christian Testimony successfully obtained the variance it needed. (Han. 116 Stmt. ¶¶16, 20 (citing 2d Am. Liou Decl. ¶¶16, 20).) Hanover claims that those promises induced Hanover to agree to perform its services under the Second and Third Agreements at a lower price than it otherwise would have charged. (*Id.* ¶¶18, 22 (citing 2d Am. Liou Decl. ¶¶18, 22).)

Christian Testimony maintains that, although Hanover repeatedly requested that it be appointed construction administrator, Chang made no such promises. (CT 116 Resp. ¶16 (citing Supp. Chang Decl. ¶¶3, 5–10).) Chang also says that Christian Testimony was not aware of Hanover's reasoning for its prices, that Hanover "never mentioned a word to us about other rates or . . . a discount," and that the only mention of prices came at the time of the Third Agreement, when Liou "mentioned that he had not raised his prices in over a year since his first agreement with us because this was a 'church project.'" (Supp. Chang Decl. ¶7; CT 116 Resp. ¶18.) Furthermore, in an email to Chang, Liou wrote "[y]our church is not obligated to hire my firm for the service of construction administration." (CT 124 Stmt. ¶32 (citing Chang Decl. ¶34, Ex. 10[6]).)

Hanover claims that on June 7, 2007, Chang informed Hanover that Christian Testimony would not be retaining Hanover for the construction administration portion of the Conversion project. (Han. 116 Stmt. ¶24 (citing 2d Am. Liou Decl. ¶24).) Christian Testimony has a different version of events: (1) that as of June 7, 2007, Christian Testimony had not yet decided whether to use a "Project Management construction method" (recommended by Hanover) or a "General Construction method"; (2) that at the June 7, 2007 meeting, Chang asked Hanover to bid for the construction administration part of the project; (3) that Hanover declined to bid on the project; and (4) that Christian Testimony eventually selected the General Construction method and Visbeen Construction as the general contractor. (CT 116 Resp. ¶24 (citing Supp. Chang Decl. ¶9; Chang Decl. Ex. 16[7]).)

---

[6]     Although Chang declares that the date of this email is August 23, 2007 (Chang Decl. ¶34), the actual exhibit is undated.

[7]     Once again, Chang declares that Liou's email was dated August 15, 2007; however, the actual exhibit is undated.

### *f. Alleged copyright infringements*

Liou has submitted seven copyright office documents to this Court: five original copyright registrations and two supplemental registrations. Liou registered the copyright of his preliminary design plans for the Conversion Project as "architectural work" with the United States Copyright Office under the name "Chiming Liou" (VA 1-627-039; effective date September 7, 2007). (Amended Complaint Ex. 18, ECF No. 22-1.[8]) Liou registered the first revision of the design plans as "2-D artwork, map and/or technical drawing" with the Copyright Office under the name "Chiming Liou, dba also known as Jimmy Liou" (VA 1-714-623; effective date April 18, 2010). (*Id.* Ex. 19, ECF No. 22-2, 3, 4.) Then, Liou filed supplemental registrations to correctly identify Hanover as the owner of the copyrights, rather than himself (VA 1-432-357 and VA 1-432-358; effective date June 22, 2010). (*Id.* Ex. 18, 19.) Liou also registered the first revision of the designs as "architectural work," with an effective date of June 24, 2010 (VA 1-731-230). (*Id.* Ex. 19.) Liou registered the second revision of the designs as both a "map and/or technical drawing," (VA 1-731-235) and "architectural work," with an effective date of June 24, 2010. (*Id.* Ex. 20, ECF No. 22-5, 6.)

Hanover informed Christian Testimony on September 5 and 19, 2007, that Hanover's copyrighted designs could not be used by Christian Testimony or any of its hired professionals without obtaining written permission from Hanover. (Han. 116 Stmt. ¶¶29–30 (citing Han. 116 Mot. Ex. 8, 9).)

On April 23, 2008, Christian Testimony's counsel, Paul E. Rusen, informed Hanover that Christian Testimony had the exclusive rights to use Hanover's design plans, that Christian Testimony intended to use

---

[8]     Hanover's motion exhibits were not filed on ECF in full. For convenience, I here refer to the duplicate copies of these particular exhibits that were electronically filed with Hanover's Amended Complaint.

the design plans, and that Wells was appointed as construction administrator. (Han. 116 Stmt. ¶32 (citing Han. 116 Mot. Ex. 10, ECF No. 122-1).) On June 20, 2008, Rusen sent a second letter stating that Christian Testimony would not be using Hanover's designs for the Conversion Project because the Parsippany Building Department had only issued a "contingent construction permit"—permitting demolition only—based on Hanover's designs. (*Id.* ¶33 (citing Han. 116 Mot. Ex. 11, ECF No. 120-2).) On July 1, 2008, Rusen sent a third letter, warning Hanover not to interfere with the Conversion Project (after hearing Hanover had spoken with the Parsippany Building Department), reminding Hanover that it was no longer the architect on the job, and informing Hanover that Christian Testimony would be redesigning the project on its own. (*Id.* ¶34 (citing Han. 116 Mot. Ex. 12, ECF No. 120-2).)

Christian Testimony's new architect, Wells, created new drawings for the Conversion Project, which Hanover says are "substantially similar" to its own plans, and Christian Testimony says are "entirely new drawings." (Han. 116 Stmt. ¶¶35–36; 116 Mot. Ex. 17, ECF No. 121-3, 121-4 (Report of Douglass Asral, Registered Architect); 2d Am. Liou Decl. ¶35; CT 116 Resp. ¶¶35–36.) Hanover's position is that Wells removed and altered the "CMI" (copyright management information) and title blocks from Hanover's design plans, but otherwise simply reproduced the plans, without Hanover's permission. (Han. 116 Stmt. ¶37 (citing 116 Mot. Ex. 13, ECF No. 120-3; 2d Am. Liou Decl. ¶37).)

Christian Testimony contends that because Hanover sent the designs in read-only pdf format, "Wells could not have simply copied Hanover's plans as Hanover has alleged, much less simply removed Hanover's title block from the plans and placed his own firm's name there instead." (CT 124 Stmt. ¶¶103–104 (citing Wells Decl. ¶¶6–7).) Christian Testimony says Wells' drawings are different from Hanover's in

many ways, for example, Wells omits large arches and a clerestory from his drawings. (CT 116 Resp. ¶37 (citing Wells Decl. ¶¶6–8).)

On April 12, 2010, Chang and Liou had a telephone conversation regarding the Conversion Project. (Han. 116 Stmt. ¶42.) Liou says that he called to inquire about the approval process for the Conversion Project and that Chang "mentioned that Christian Testimony-Morris had not redesigned the project before constructing it." (2d Am. Liou Decl. ¶42.) Chang says that Liou called "to apologize that he did not come to Christian Testimony's August 15, 2009 celebration meeting to which we had invited him," and that, when Chang was asked about the status of the construction, he "mentioned to [Liou] only that we were using the conceptual layout from the variance approval that the Church itself originally designed before Hanover started work and for which we paid Hanover in full prior to completion of its responsibilities." (Supp. Chang Decl. ¶12.)

## B. Procedural history

Hanover first filed a complaint on October 21, 2010. (ECF No. 1.) Defendants moved to dismiss on January 18, 2011. (ECF No. 10.) Hanover then filed an amended complaint on March 28, 2011. (ECF No. 22.) Defendants once again moved to dismiss on April 25, 2011. (ECF No. 23.) On November 29, 2011, Judge Wigenton granted Defendants' motion to dismiss Hanover's fraud claim, but denied the motion as to all other claims. (Opinion ECF No. 28; Order ECF No. 29.) Her opinion noted that Hanover voluntarily withdrew its unfair competition claim. (*Id.*)

On December 28, 2011, Defendants filed an answer to the amended complaint along with counterclaims. (ECF No. 32.)

On August 9, 2012, this case was reassigned from Judge Wigenton to me. (ECF No. 53)

On October 3, 2012, Hanover filed a motion for partial summary

judgment on Christian Testimony's counterclaim for breach of contract. (ECF No. 54.) That motion was referred to Judge Dickinson R. Debevoise for decision.

On January 24, 2014, Judge Debevoise partially granted Hanover's motion for summary judgment as to two parts of Christian Testimony's counterclaim, finding that they sounded in malpractice and therefore ran afoul of New Jersey's requirement of an Affidavit of Merit. Judge Debevoise denied the motion in all other respects. (Opinion ECF No. 97; Order ECF No. 98.) On February 10, 2014, Christian Testimony moved for reconsideration of Judge Debevoise's order granting partial summary judgment in Hanover's favor. (ECF No. 100.) On March 6, 2014, Judge Debevoise granted Christian Testimony's motion for reconsideration and reversed his prior order. (Opinion ECF No. 143; Order ECF No. 144.)

The overall effect of Judge Debevoise's two decisions, then, was a complete denial of Hanover's summary judgment motion. The counterclaim for breach of contract was permitted to "move forward in its entirety." (ECF No. 143, at 13.)

Now, Hanover once again moves for partial summary judgment on Christian Testimony's first counterclaim for breach of contract. (ECF No. 101.) Hanover also moves for summary judgment on the claims in its own complaint. (ECF No. 116.) Defendants cross-move for summary judgment on Hanover's claims and also on Christian Testimony's counterclaim for breach of contract. (ECF No. 124.)

## II.   JURISDICTION

This Court exercises jurisdiction over the parties' copyright claims pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1338(b) (copyright jurisdiction). This Court exercises

supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

### III.    SUMMARY JUDGMENT STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Daniels v. Sch. Dist. Of Phila.*, No. 14-1503, 2015 WL 252428, at *6 (3d Cir. Jan. 20, 2015). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *Heffernan v. City of Paterson*, No. 14-1610, 2015 WL 265514, at *2 (3d Cir. Jan. 22, 2015). The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing'— that is, pointing out to the district court— that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. The existence, or not, of a genuine, material issue must be considered in light of the ultimate burden of proof—here, proof by clear and convincing evidence. *See* p. 14, *infra*; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 244 (1986) (the "clear and convincing" standard must be considered on a motion for summary judgment).

If the moving party meets its threshold burden, the opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *see also* Fed R. Civ. P. 56(c) (setting forth types of evidence on which nonmoving party must rely to support its assertion that genuine issues of material fact exist). "[U]nsupported allegations ... and pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorporation*, 912 F.2d 654,

657 (3d Cir. 1990); *see also Gleason v. Norwest Mortg., Inc.*, 243 F.3d 130, 138 (3d Cir. 2001) ("A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial.").

When, as here, the parties file cross-motions for summary judgment, the governing standard "does not change." *Clevenger v. First Option Health Plan of N.J.*, 208 F. Supp. 2d 463, 468–69 (D.N.J. 2002) (citing *Weissman v. U.S.P.S.*, 19 F. Supp. 2d 254 (D.N.J. 1998)). The court must consider the motions independently, in accordance with the principles outlined above. *Goldwell of N.J., Inc. v. KPSS, Inc.*, 622 F. Supp. 2d 168, 184 (2009); *Williams v. Philadelphia Hous. Auth.*, 834 F. Supp. 794, 797 (E.D. Pa. 1993), *aff'd*, 27 F.3d 560 (3d Cir. 1994). That one of the cross-motions is denied does not imply that the other must be granted. For each motion, "the court construes facts and draws inferences in favor of the party against whom the motion under consideration is made" but does not "weigh the evidence or make credibility determinations" because "these tasks are left for the fact-finder." *Pichler v. UNITE*, 542 F.3d 380, 386 (3d Cir. 2008) (internal quotation and citations omitted).

## IV.   CROSS-MOTIONS FOR SUMMARY JUDGMENT

The parties have filed cross-motions for summary judgment. Because numerous issues of fact remain as to the parties' claims and defenses, the motions are DENIED.

### A. Christian Testimony's breach of contract claim (Counterclaim 1)

Christian Testimony alleges that Hanover breached the Second and Third Agreements by: (1) providing incomplete electrical, plumbing, and fire protection designs; (2) refusing to grant Christian Testimony's request to modify the designs to remove certain expensive features; (3) preparing drawings that would have entailed construction costs that

were over Christian Testimony's budget; (4) misclassifying the Conversion Project facility under the building codes so as to require a costly firewall and refusing to cooperate with the Parsippany Township Building Department to resolve the issue; and (5) failing to obtain a construction permit. (*See* CT 124 Mot. 22–23; CT 101 Opp. 1, 4–5.) Christian Testimony also accuses Hanover of overbilling for overtime at a rate of $225 per hour, rather than the $120 per hour specified in the Agreements. (CT 101 Opp. 1.)

Neither party relies on the Agreements as written; both claim that there were understandings outside the four corners of the contract. Because issues of material fact remain, summary judgment is inappropriate for either party on Christian Testimony's breach of contract claim.

To establish a breach of contract claim, Christian Testimony must show (1) "that the parties entered into a valid contract"; (2) "that the defendant failed to perform [its] obligations under the contract"; and (3) "that the plaintiff sustained damages as a result." *Murphy v. Implicito*, 920 A.2d 678, 689 (N.J. Super. Ct. App. Div. 2007).[9]

---

[9]      "[I]n a diversity action, a district court must apply the choice of law rules of the forum state to determine what law will govern the substantive issues of a case." *Warriner v. Stanton*, 475 F.3d 497, 499–500 (3d Cir. 2007) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). New Jersey uses the most-significant-relationship test, which consists of two prongs. *Maniscalco v. Brother Int'l Corp. (USA)*, 793 F. Supp. 2d 696, 704 (D.N.J. 2011), *aff'd*, 709 F.3d 202 (3d Cir. 2013). First, the court must determine whether a conflict actually exists between the potentially applicable laws. *P.V. v. Camp Jaycee*, 197 N.J. 132, 143, 962 A.2d 453, 460 (2008) ("Procedurally, the first step is to determine whether an actual conflict exists. That is done by examining the substance of the potentially applicable laws to determine whether there is a distinction between them.") (internal quotations omitted). "[I]f no conflict exists, the law of the forum state applies." *Snyder v. Farnam Companies, Inc.*, 792 F. Supp. 2d 712, 717 (D.N.J. 2011) (quoting *P.V.*, 197 N.J. at 143, 962 A.2d at 453). If a conflict exists, the court then moves to the second prong: it must determine "which state has the 'most significant relationship' to the claim at issue by weighing the factors" in the applicable section of the Restatement (Second) of Conflict of Laws. *Gilbert Spruance Co. v. Pennsylvania Mfrs. Ass'n*

Because issues of fact clearly bar an award of judgment, I will not analyze each and every alleged breach of the contract. An adequate flavor is given by consideration of the evidence underlying two of the breaches alleged by Christian Testimony: (1) that Hanover did not complete electrical, plumbing, and fire protection designs; and (2) that Hanover refused to modify the designs, per Christian Testimony's request, to remove certain expensive features that were over Christian Testimony's budget. I discuss the rest in summary fashion.

### i. *Hanover's allegedly incomplete electrical, plumbing, and fire protection designs*

Christian Testimony alleges that Hanover did not fulfill its responsibilities under the Second or Third Agreements to provide electrical, plumbing, and fire protection designs. (Answer & Counterclaims ¶¶274–75, ECF No. 32; CT 124 Stmt. ¶56.)[10] As Judge Debevoise noted, this alleged breach requires proof of (1) the terms of the Second and Third Agreements, to determine what Hanover was required to provide; and (2) the designs Hanover actually provided. (Jan. 24, 2014 Opinion at 17–18, ECF No. 97.)

What Hanover was "required to provide" is similar, but not identical, under the Second and Third Agreements.

Under the Second Agreement, Hanover was required to provide: (1)

---

*Ins. Co.*, 134 N.J. 96, 102, 629 A.2d 885, 888 (1993).

The parties seem to agree that New Jersey law applies in this diversity action. At any rate, they point to no aspect in which the application of non-forum law would change the result. Having been directed to no applicable conflict, I apply general principles of New Jersey contract law.

[10]   Confusingly, Christian Testimony undermines its contentions as to this breach. In its motion papers it states that this is not a "primary" breach, although it is a "piece of evidence fitting a pattern of non-performance." (CT 101 Opp. 1, 3.) Judge Debevoise certainly regarded this as one of Christian Testimony's claims of breach. (*See* Jan. 24, 2014 Opinion at 17, ECF No. 97.) At any rate, Christian Testimony presents these facts as highly "material" to the issues, and therefore worthy of consideration on summary judgment.

"Electric Design—lighting fixtures, switches and receptacles"; (2) "Plumbing Design—plumbing fixtures and riser diagram"; and (3) "Fire Protection layout—Modify existing automatic sprinkler system layout." (Chang Decl. Ex. 2.) Specifically excluded from Hanover's duties were: (1) "Electrical panels, load and wiring design"; and (2) "automatic sprinkler system design." (*Id.*)

Under the Third Agreement, Hanover was required to provide: (1) "Electric Design—lighting fixtures, switches and receptacles"; and (2) "Plumbing Design—plumbing fixtures and riser diagram." (Chang Decl. Ex. 3.) Specifically excluded from Hanover's duties were: (1) "Electrical panels, load and wiring design"; and (2) "automatic sprinkler system and fire protection designs." (*Id.*)

The Second Agreement, as Christian Testimony admits, is "somewhat ambiguous" in first requiring Hanover to "[m]odify existing automatic sprinkler system layout" and then "separately stating that Hanover was not responsible for the automatic sprinkler system design." (CT 101 Opp. 4–5.) This would appear to present an issue of fact, but Christian Testimony argues that this ambiguity should be resolved against Hanover, the drafter. (*Id.*) The Third Agreement clearly excludes "automatic sprinkler system . . . designs" from Hanover's responsibilities. (Chang Decl. Ex. 3.)

As for what Hanover "actually provided," Christian Testimony points to three alleged shortcomings: Hanover wrongfully failed to provide (1) electrical designs for switches and receptacles; (2) designs for plumbing fixtures (other than plumbing fixtures and a riser diagram); and (3) the fire protection layout and designs for the modification of the automatic sprinkler system. (CT 124 Stmt. ¶56 (citing Chang Decl.

¶55).)[11]

Hanover's response is essentially that the parties agreed to modify its duties or transfer them to others. Hanover submits testimony that "[s]witches and receptacles were subsequently removed from Hanover's scope of services following discussions with James Chang in 2007 as a result of redundancy with work being performed by the electrical engineer." (Supp. Liou Decl. ¶19; Han. 124 Resp. ¶56.) As to the fire sprinkler system, Hanover cites the exclusion in the Second Agreement. (Han. 124 Resp. ¶56; Supp. Liou Decl. ¶20.) Finally, Liou explains on Hanover's behalf that:

> The mechanical engineer proposed a new wet pipe sprinkler system. With the change to the new system, the "provision of fire protection layout—modify existing automatic sprinkler system layout" [requirement of the Second Agreement] was no longer necessary. Christian Testimony was aware of and agreed to this change.

(Liou Decl. ¶20.)

Essentially, this alleged breach boils down to a credibility contest between Chang and Liou regarding (1) what Hanover's responsibilities were intended to be under the Second Agreement (given the unclear language); and (2) whether these responsibilities were later modified in conversations between Hanover and Christian Testimony. These issues of material fact preclude granting summary judgment to either side.

    ii.  *Hanover's refusal to modify the designs, per Christian Testimony's request, to remove certain expensive features that were over Christian Testimony's budget*

Christian Testimony also alleges that Hanover breached the Agreements by drafting designs that would have exceeded Christian Testimony's construction budget and refusing to modify the designs to

---

[11]   The Chang Declaration states that the plumbing fixtures were not developed by Hanover, so it is unclear what Christian Testimony's position is with respect to the plumbing fixtures. (Chang Decl. ¶55.)

reduce anticipation construction costs. These allegations require proof (1) of an agreement to a particular budget and (2) that the agreement was incorporated into the Third (or any) Agreement—both issues of material fact that preclude granting summary judgment.

Christian Testimony has proffered testimony in support of its position. Chang declares that (1) "the purpose of the three agreements was to furnish the Church with a building design . . . and to do so within [] Christian Testimony's budget"; (2) "Christian Testimony informed Hanover of its budget constraints before Hanover began working on the redesign project for Christian Testimony, and Hanover was aware of and acknowledged the budget constraints under which it and Christian Testimony agreed to operate"; and (3) "[p]rior to entering [into the First Agreement], Hanover assured the Church that it would be able to create a design that could be built within [Christian Testimony's] $1 million budget." (Chang Decl ¶¶13, 16, 32.)

Hanover cannot credibly contend that there was *no* budget. Liou declares, however, that it was only in April of 2005 (after the First Agreement was signed) that Chang first "informally advised [Liou] that Christian Testimony's budget for the first phase of the construction was $1.2 million." (2d Supp. Liou Decl. ¶40.) Liou also declares that in 2006, after the Second Agreement was executed, Chang "advised [Liou] that the budget had become $2.5 million dollars to include the second phase of construction." (*Id.*) Finally, Liou maintains that "[e]ach of these discussions was informal, and at no time did Christian Testimony allocate a percentage of the budget to the architectural work, much less make agreement[s as] to a particular budget amount [to be incorporated into] any of the Agreements." (*Id.*)

Summary judgment is therefore denied because issues of fact remain regarding (1) whether the parties agreed to a particular budget; and (2) how that budget was incorporated into the Agreements.

### iii. Other claims of breach

The two issues discussed above set the pattern. Christian Testimony alleges several other breaches of contract: (1) Hanover prepared drawings that would have entailed construction costs that were over Christian Testimony's budget; (2) Hanover misclassified the Conversion project facility under the building codes so as to require a costly firewall, and Hanover refused to cooperate with the Parsippany Township Building Department to resolve the issue; and (3) Hanover failed to obtain a construction permit. (*See* CT 124 Mot. 22–23; CT 101 Opp. 1, 4–5.)

For each breach, Christian Testimony states that certain responsibilities were included in the Agreements, that Hanover's performance was deficient, and that Christian Testimony was harmed as a result. For example, Christian Testimony proffers evidence that Hanover incorrectly classified the Conversion Project facility, that Hanover refused to correct its mistakes, and that this alleged breach resulted in additional costs to Christian Testimony. (CT 124 Stmt. ¶¶70–73 (citing Wells Decl. ¶9; Chang Decl. ¶¶66–69; Visbeen Decl. ¶¶4, 6).) Christian Testimony also offers proof that Hanover failed to obtain the construction permits required by the Agreements. (CT 124 Stmt. ¶96 (citing Chang Decl. ¶85, Ex. 17; Wells Decl. ¶¶3, 9; Visbeen Decl. ¶5).)

For each breach, Hanover responds that it was not responsible for the duties under the Agreements or that its performance was not deficient. The budget issues have already been discussed above. Hanover also proffers evidence that it properly classified the Conversion Project facility and that any delays or costs associated with the Parsippany Building Department's issuance of permits were not Hanover's fault. (Han. 124 Resp. ¶¶70–75 (citing Report of Joseph P. Tomaino, AIA, P.E., ECF No. 111-1; Supp. Liou Decl. ¶¶25, 26).) Finally, Hanover says that the construction permits it obtained were sufficient. (*Id.* ¶¶90, 96 (citing

Tomaino Report at 14).)

Because issues of fact remain as to each alleged breach, summary judgment is inappropriate for either side.

## B. Hanover's copyright infringement claims (Hanover's Claims 1, 2)

Hanover and Defendants cross-move for summary judgment as to Hanover's claims of copyright infringement. Summary judgment is inappropriate for either side.

To prove copyright infringement, a plaintiff must show: "'(1) ownership of a valid copyright; and (2) copying of constituent elements of the work that are original.'" *Jackson v. Booker*, 465 F. App'x 163, 165 (3d Cir. 2012) (quoting *Feist Publications, Inc. v. Rural Telephone Service. Co.*, 499 U.S. 340, 361 (1991)). Christian Testimony disputes both of these elements, arguing that (i) Hanover's designs did not include any original elements and were therefore not copyrightable; (ii) Christian Testimony's second architect, Wells, did not copy any original or copyrightable elements of Hanover's designs; (iii) Hanover's copyrights are invalid because they were filed under Liou's name, rather than Hanover's; (iv) if there is anything copyrightable about the designs, Christian Testimony owns those copyrights—either solely or jointly with Hanover; (v) that Hanover committed fraud on the United States Copyright Office; and (vi) that Christian Testimony has an implied license to use Hanover's designs.

### i. *Whether Hanover's designs are original*

Christian Testimony has not overcome the presumption that Hanover's designs contain at least some minimum level of originality.

As the Supreme Court has explained:

> The *sine qua non* of copyright is originality. To qualify for copyright protection, a work must be original to the author. Original, as the term is used in copyright, means only that

> the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity. To be sure, the requisite level of creativity is extremely low; even a slight amount will suffice. The vast majority of works make the grade quite easily, as they possess some creative spark, no matter how crude, humble or obvious it might be.

*Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 345–46 (1991) (internal quotations and citations omitted). Also, "[t]he mere fact that a work is copyrighted does not mean that every element of the work may be protected." *Id.* at 348. Rather, "copyright protection may extend only to those components of a work that are original to the author." *Id.*

A Certificate from the Copyright Office is prima facie evidence of a valid copyright, and therefore of some original element in the copyrighted work. *See Value Grp., Inc. v. Mendham Lake Estates, L.P.*, 800 F. Supp. 1228, 1232 (D.N.J. 1992); *Masquerade Novelty, Inc. v. Unique Indus., Inc.*, 912 F.2d 663, 667 (3d Cir. 1990) (referring to 17 U.S.C. § 410(c)); *Ford Motor Co. v. Summit Motor Products, Inc.*, 930 F.2d 277, 290–91 (3d Cir. 1991). Christian Testimony rebuts this evidence with proof that it provided certain preliminary drawings to Hanover, initially instructed Hanover about the elements it wanted the designs to include, and requested that Hanover modify certain features during the design process. (CT 124 Stmt. ¶¶15–29; *see* Chang Decl. ¶¶17–31, Ex. 5, 6, 8.) For example, Christian Testimony says it instructed Hanover to draw 45-degree angled corners on the altar, to include a raised baptistery at the rear of the altar, to include two entrances to changing rooms, to change the location of the bar window of the audio-visual room, to change the shape of the coat rooms to have 45-degree angles, to expand the width of the main sanctuary, and to modify the ceiling design in the main sanctuary. (Chang Decl. ¶¶22–28.) Such elements, says Christian Testimony, are original to itself, not to Hanover.

Christian Testimony has not proven, however, that *no* element of

Hanover's designs is original. As the *Feist* Court implied, a copyrighted work may consist of original as well as unoriginal elements. At most, Christian Testimony has shown that it provided Hanover with preliminary designs for the Conversion Project and asked for certain modifications to be made. It has not shown that Hanover's designs are entirely devoid of "some creative spark, not matter how crude, humble or obvious it might be." *Feist*, 499 U.S. at 345. Christian Testimony's own exhibit (Chang Decl. Ex. 8) reveals just what a fact-laden inquiry it would be to prove that no element of Hanover's designs was original. And Hanover's expert, Douglass Asral, Registered Architect, stated in an expert report that "there are certain aspects of Mr. Liou's design that are arbitrary and serve no specific function are uniquely particular to his vision, such as the angled walls in the Lobby, Main Sanctuary and the partially recessed Entrance Doors." (Han. 116 Mot. Ex. 17, ECF No. 121-3, 121-4 ("Asral Report").)

That another person germinated the ideas contained in a work does not preclude a claim of copyright infringement. By statute, "[i]n no case does copyright protection for an original work of authorship extend to any *idea*, procedure, process, system, method of operation, concept, principle, or discovery." 17 U.S.C. § 102 (emphasis added). "As a general rule, the author is the party who actually creates the work, that is, the person who translates an idea into a fixed, tangible expression entitled to copyright protection." *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 737 (1989). Even if Christian Testimony's requests were original, Hanover's translation of those requests into tangible designs may be copyrightable.

Christian Testimony has not dispelled the presumption of originality that comes from the Certificate from the Copyright Office. Issues of fact remain, and summary judgment is denied.

### ii. Whether Wells copied any original or copyrightable elements of Hanover's designs

There are likewise issues of fact regarding whether Wells (who took over the project) copied any original or copyrightable elements of Hanover's designs.

Hanover's evidence regarding the similarity between Liou's and Wells's designs is as follows. First, Liou, an architect himself, declares that Wells's designs "are substantially similar to those of Hanover's plans." (2d Am. Liou Decl. ¶36.) Second, Hanover submits the expert report of Douglass Asral, in which Asral itemizes the similarities between the designs and explains that "there are certain aspects of Mr. Liou's design that are arbitrary and serve no specific function and are uniquely particular to his vision, such as the angled walls in the Lobby, Main Sanctuary and the partially receded Entrance Doors." (Asral Report.) Asral concludes that "[i]t is highly unlikely these specific elements would be produced independently by another creator in the very same manner, size and location as they appear to be in both sets of plans." (*Id.*) Third, Liou says that when he called Chang on April 12, 2010, to inquire about the approval process for the Conversion Project, Chang "mentioned that Christian Testimony-Morris had not redesigned the project before constructing it." (2d Am. Liou Decl. ¶42.)

Christian Testimony offers the following evidence to the contrary. First, Christian Testimony contends that because Hanover sent the designs in read-only pdf format, "Wells could not have simply copied Hanover's plans as Hanover has alleged, much less simply removed Hanover's title block from the plans and placed his own firm's name there instead." (CT 124 Stmt. ¶¶103–104 (citing Wells Decl. ¶¶6–7).) Second, Christian Testimony says Wells's drawings are different from Hanover's in many ways: for example, Wells omits large arches and a clerestory from his drawings. (CT 116 Resp. ¶37 (citing Wells Decl. ¶¶6–

8).) Third, Chang disputes Liou's account of the April 12, 2010 phone call. When Liou asked Chang about the status of the construction, Chiang allegedly "mentioned to [Liou] only that we were using the conceptual layout from the variance approval that the Church itself originally designed before Hanover started work and for which we paid Hanover in full prior to completion of its responsibilities." (Supp. Chang Decl. ¶12.) Fourth, Christian Testimony submits the rebuttal expert report of Thomas V. Ashbahian, Registered Architect, in which Ashbahian explains why the elements of Liou's designs are not original (and therefore not copyrightable in the first place). (Moskin Decl. Ex. 27, ECF No. 128-1.)

Whether Wells is liable for copying original elements of Liou's designs depends on disputed issues of fact.

### iii.   Ownership, Fraud on Copyright Office, Implied License, Registration in Liou's Name

Because of the issues of fact identified above, summary judgment cannot be granted to either party on the copyright claims. I briefly discuss other proffered defenses.

*Joint ownership/fraud on Copyright Office.* Christian Testimony claims, for example, that it is sole or joint owner of Hanover's work, because Hanover's drawings were derived from its own. Christian Testimony claims that Hanover defrauded the Copyright Office by failing to reveal that its own designs derived from those of Christian Testimony. As noted above, the degree of similarity or the extent of copying, if any, pose issues of fact. Those issues of fact bar summary judgment as to ownership or fraud on the Copyright Office.

*Implied license.* Christian Testimony argues that it retained an implied license to use Hanover's designs. (CT 16 Opp. 15–17.) "The owner of a copyright can transfer ownership of the copyright by selling it or by exclusively licensing it." *MacLean Assocs., Inc. v. Wm. M. Mercer-*

*Meidinger-Hansen, Inc.*, 952 F.2d 769, 778 (3d Cir. 1991) (citing 17 U.S.C. § 101.) Such exclusive licenses must be in writing. *Id.* (citing 17 U.S.C. § 204(a)). However, "[a] nonexclusive license may be granted orally, or may even be implied from conduct." *Id.* at 779 (quoting 3 M. Nimmer & D. Nimmer, *Nimmer on Copyright* § 10.03[A], at 10–37 (1991)) (internal quotations omitted). It is the defendant's burden to prove the affirmative defense of implied license. *Nat'l Ass'n For Stock Car Auto Racing, Inc. v. Scharle*, 184 F. App'x 270, 275 (3d Cir. 2006) (citing *Atkins v. Fischer*, 331 F.3d 988, 992 (D.C. Cir. 2003)). "Whether there is an implied license is determined by an objective inquiry into the facts; the private hopes of the creator are not relevant." *Id.* (citing *John G. Danielson, Inc. v. Winchester–Conant Props., Inc.*, 322 F.3d 26, 42 (1st Cir. 2003)). As to the existence of an implied license, The Third Circuit has adopted a three-factor test:

> (1) a person (the licensee) requests the creation of a work, (2) the creator (the licensor) makes the particular work and delivers it to the licensee who requested it, and (3) the licensor intends that the licensee-requestor copy and distribute his work.

*Nat'l Ass'n For Stock Car Auto Racing, Inc.*, 184 F. App'x at 275 (citations omitted). Even where a license is found, "the licensor can still bring suit for copyright infringement if the licensee's use goes beyond the scope of the nonexclusive license. *MacLean*, 952 F.2d at 779 (citation omitted).

The third element of the nonexclusive implied license test—whether Hanover intended that Christian Testimony copy and distribute the designs—remains in dispute. True, the designs were intended for use, not display. But Hanover has introduced letters to Christian Testimony warning that the designs were copyrighted and that Christian Testimony must seek its permission before using them. (Chang Decl. Ex. 14, Amended Complaint Ex. 13, ECF No. 22-1.) The scope of any license, too, is the subject of factual dispute. It is not at all clear that Hanover

would have approved the *alteration* of its designs or the use of its designs by others in the event Hanover was not retained as construction administrator.[12] These material issues of fact as to the license issue, too, preclude summary judgment.

*Erroneous name on application.* Finally, Christian Testimony argues that because the first copyright registration (VA 1-627-039) was in Liou's name instead of Hanover's, it is of no legal effect, and Hanover lacks standing to sue. (CT 116 Opp. 29–30.) "[A]n otherwise valid registration is not jeopardized by inadvertent, immaterial errors in an application." *Gallup, Inc. v. Kenexa Corp.*, 149 F. App'x 94, 96 (3d Cir. 2005) (citing *Raquel v. Educ. Mgmt. Corp.*, 196 F.3d 171, 177 (3d Cir.1999), *cert. granted and judgment vacated on other grounds*, 531 U.S. 952 (2000)).

> A misstatement is material if it might have influenced the Copyright Office's decision to issue the registration. Significantly, the Register reviews applications only to determine whether the material deposited constitutes copyrightable subject matter and [whether] the other legal and formal requirements . . . have been met. In practice, therefore, a misrepresentation is likely to affect the Register's decision only if it concerns the copyrightability of the work.

*Id.* (internal quotations and citations omitted). It seems unlikely that the

---

[12]    Indeed, there is evidence that Hanover refused to modify its designs when asked to do so by Christian Testimony because Liou didn't want a modified design to "bear [his] name and damage [his] reputation of creativity." (Chang Decl. Ex. 14.) Moreover, Christian Testimony's own position is that Hanover refused to perform its duties unless it was appointed construction administrator for the project, citing a letter from Liou on September 19, 2007. (CT 124 Stmt. ¶79 (citing Chang Decl. ¶73, Ex. 14.) In the same September 19, 2007 letter, Hanover informs Christian Testimony that its designs are protected by copyright law and that Christian Testimony must obtain Hanover's written permission before using the drawings. (Chang Decl. Ex. 14.) In a previous September 5, 2007 letter, Liou also warned that his designs were copyrighted and could not be used without written permission, and wrote that he was concerned that, if Hanover was not involved with construction administration, Christian Testimony "may expose my firm and myself to certain risks during and/or after construction." (Amended Complaint Ex. 13, ECF No. 22-1.) These letters suggest Hanover may have intended to grant an implied license only if it was appointed construction administrator, as expected.

Copyright Office would have declined to issue the copyright certificate if Hanover had been listed as the owner of the designs from the beginning. After all, the Office accepted Liou's supplemental registrations naming Hanover as the owner of the rights. (*See* Amended Complaint Ex. 18, 19, VA 1-432-357 and VA 1-432-358; effective date June 22, 2010). *See Jules Jordan Video, Inc. v. 144942 Canada Inc.*, 617 F.3d 1146 (9th Cir. 2010) (copyright not invalid because sole shareholder inadvertently registered company's copyright in his own name). At best, this defense presents yet another issue of fact.

### C. Hanover's Digital Millennium Copyright Act claims (Hanover's Claims 3, 4, 5, 6)

Defendants and Hanover seek summary judgment as to Hanover's claim that Defendants violated the Digital Millennium Copyright Act.

The Digital Millennium Copyright Act, 17 U.S.C. § 1202(a), prohibits a person from "knowingly and with the intent to induce, enable, facilitate, or conceal infringement—(1) provide [CMI] that is false, or (2) distribute or import for distribution [CMI] that is false." Section 1202(b) prohibits the removal or alteration of copyright management information (CMI) without the copyright owner's authority. Specifically, a person may not:

> (1) intentionally remove or alter any copyright management information,
>
> (2) distribute or import for distribution copyright management information knowing that the copyright management information has been removed or altered without authority of the copyright owner or the law, or
>
> (3) distribute, import for distribution, or publicly perform works, copies of works, or phonorecords, knowing that copyright management information has been removed or altered without authority of the copyright owner or the law

17 U.S.C. § 1202(b).

Copyright management information is defined as "any of the

following information conveyed in connection with copies or
phonorecords of a work or performances or displays of a work, including
in digital form. . . :

> (1) The title and other information identifying the work,
> including the information set forth on a notice of copyright.
>
> (2) The name of, and other identifying information about, the
> author of a work.
>
> (3) The name of, and other identifying information about, the
> copyright owner of the work, including the information set
> forth in a notice of copyright.
>
> . . .
>
> (6) Terms and conditions for use of the work.
>
> (7) Identifying numbers or symbols referring to such
> information or links to such information.
>
> (8) Such other information as the Register of Copyrights may
> prescribe by regulation, except that the Register of
> Copyrights may not require the provision of any information
> concerning the user of a copyrighted work.

*Id.*

Hanover alleges that Wells removed the following CMI from
Hanover's designs: (1) the title block, digitally created on AutoCAD
software, which includes Hanover's address, phone number, and
facsimile number, and says that Hanover is the producer of the designs;
(2) the words "COPYRIGHT © 2007 Chiming Liou" in the title block; and
(3) the words "This construction document including design and all
drawings is protected by federal copyright law and should not be
completely or partially copied, modified or reproduced in any forms and
for any purposes without the architect's written permission." (Han. 116
Mot. 22–23.) Hanover accuses Wells of replacing Hanover's CMI with his
own information. (*Id.*) Hanover also accuses Christian Testimony of
unlawfully distributing Hanover's designs while knowing that CMI had
been removed, in violation of 17 U.S.C. § 1202. (*Id.*)

Christian Testimony replies that Wells's drawings were new drawings, not copies of Hanover's drawings with the CMI removed. (CT 116 Opp. 17–20.) Christian Testimony perhaps oversteps in arguing that removal of the CMI was impossible because Liou submitted his designs in read-only pdf format. (CT 124 Stmt. ¶99 (citing Wells Decl. ¶7).) Nevertheless, whether and how Wells copied Hanover's drawings and removed CMI are disputed.

Summary judgment is denied as to Hanover's DMCA claim.

### D. Hanover's conspiracy claims (Hanover's Claims 1–6)

Hanover alleges that Christian Testimony and all other defendants engaged in a conspiracy to infringe on Hanover's copyrights and violate the DMCA.

> In New Jersey, a civil conspiracy is a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage.

*G.D. v. Kenny*, 984 A.2d 921, 934 (N.J. Super. Ct. App. Div. 2009) *aff'd*, 205 N.J. 275, 15 A.3d 300 (2011) (internal quotations and citations omitted). "It is enough [for liability] if you understand the general objectives of the scheme, accept them, and agree, either explicitly or implicitly, to do your part to further them." *Banco Popular N. Am. v. Gandi*, 876 A.2d 253, 263 (N.J. 2005) (internal quotation and citation omitted). "It is well known that the nature of a conspiracy is such that more often than not the only type of evidence available is circumstantial in nature." *Morgan v. Union Cnty. Bd. of Chosen Freeholders*, 633 A.2d 985, 998 (N.J. Super. Ct. App. Div. 1993) (internal quotation and citation omitted).

The New Jersey cases hold that a conspiracy may be inferred from circumstantial evidence. Here, however, I have already found that there

are issues of fact as to the unlawful acts that are alleged to be the conspiracy's objects. Those issues create issues of fact as to the conspiracy as well. Hanover has presented some evidence of copyright infringement. Christian Testimony concededly hired numerous parties—the other defendants—to design and construct the new church facility. (CT 124 Stmt. ¶¶5–8.) It is not unreasonable to infer that, *if* the object of Christian Testimony's conduct was copyright infringement (a disputed issue), then parties involved with the design and construction for the Conversion Project would have known that.[13]

Summary judgment is denied as to the conspiracy claims.

### E. Secondary and vicarious liability

Christian Testimony argues that Hanover cannot prove vicarious or secondary liability of any Defendant other than Christian Testimony regarding the copyright claims. (CT 124 Mot. 18–20.)

To establish vicarious liability, a plaintiff must show (1) "that the defendant has the right and ability to supervise the infringing activity"; and (2) that the defendant "also has a direct financial interest in such activities." *Parker v. Google, Inc.*, 242 F. App'x 833, 837 (3d Cir. 2007) (internal citations and quotations omitted). "Financial benefit exists where the availability of infringing material acts as a draw for customers. There is no requirement that the draw be substantial." *Id.* To establish secondary liability—or contributory infringement—a plaintiff must show

---

[13]    All defendants were involved with the design of the Conversion Project or the construction of the project based on the designs. (CT 124 Stmt. ¶¶5–8.) Visbeen, Wells, the Reiner Group, and Liu each supervised their portions of the design or construction. Visbeen of Visbeen Construction was responsible for at least a portion of the permits application process, communicated with Christian Testimony about modifications to Hanover's designs, and participated in meetings with Hanover and the Parsippany Building Department. (Supp. Liou Decl. ¶25; CT 124 Stmt. 25; Chang Decl. ¶28; Visbeen Decl. ¶4.) Wells of Wells Architect drafted the final design plans used by Christian Testimony. Liu of ESEC designed the fire alarm system. (CT 124 Stmt. 8; 2d Am. Liou Dec. ¶40.) Reiner Group designed the heating, ventilation, and air conditioning system. (CT 124 Stmt. ¶7.)

"(1) direct copyright infringement of a third-party; (2) knowledge by the defendant that the third-party was directly infringing; and (3) material contribution to the infringement." *Id.* (citing *Columbia Pictures Indus., Inc. v. Redd Horne, Inc.*, 749 F.2d 154, 160 (3d Cir. 1984)).

Summary judgment must be denied as to vicarious or secondary liability, essentially for the same reasons expressed in Section IV.D with respect to conspiracy.

### F. Hanover's negligent misrepresentation claim

Defendants and Hanover both seek summary judgment as to Hanover's negligent misrepresentation claim. Negligent misrepresentation under New Jersey law consists of "[a]n incorrect statement, negligently made and justifiably relied upon and economic loss sustained as a consequence of that reliance." *Rapid Models & Prototypes, Inc. v. Innovated Solutions*, No. CIV. 14-277 NLH/KMW, 2014 WL 7384186, at *11 (D.N.J. Dec. 29, 2014) (quoting *Green v. Morgan Props.*, 73 A.3d 478, 493–94 (N.J. 2013)) (internal quotations and citation omitted). Because there is a fact issue as to whether Chang made any promises to Liou to hire Hanover as a construction administrator, summary judgment is inappropriate for either side.

Hanover accuses Chang of negligently misleading Hanover into thinking Hanover would be administering the construction project. (Han. 116 Mot. 24–25.) Liou asserts that he relied on this false representation and agreed to provide services to Christian Testimony under the Second and Third Agreements at below the fair market price. Liou says he expected to "recoup" his "investment" in the project by administering the construction of it. Christian Testimony, however, did not retain Hanover as construction administrator, causing economic loss to Hanover. (2d Am. Liou Decl. ¶¶16, 18, 20, 22.)

Christian Testimony replies that Chang never specifically assured

Liou that Hanover would be retained as the construction administrator. Indeed, Christian Testimony did not itself know how construction would be administered until mid-2007. (CT 116 Opp. 20–23.) Christian Testimony cites an email from Liou to Chang, in which Liou wrote: "Your church is not obligated to hire my firm for the service of construction administration." [14] (CT 124 Stmt. ¶32 (citing Chang Decl. ¶34, Ex. 10).) And Chang, in his declaration, denies making promises or representations to Liou regarding appointment as construction administrator. (Chang Supp. Decl. ¶¶3, 6, 7; *see also* ¶¶5, 8.)

These factual accounts clash. Issues of material fact remain as to whether Chang made representations to Liou regarding construction administration and whether Liou justifiably relied on such representations. Summary judgment is denied as to Hanover's negligent misrepresentation claim.

## V.   CONCLUSION

Neither side has carried its burden under Fed. R. Civ. P. 56 of showing that there is no genuine dispute of material fact as to any of the claims. Accordingly, all motions for summary judgment are DENIED.

Dated: May 18, 2015

**Hon. Kevin McNulty**
**United States District Judge**

---

[14]      Chang declares that the date of this email is August 23, 2007 (Chang Decl. ¶34), but the exhibit is undated.

## ADDENDUM: CITATIONS

### *Rule 56.1 Statements:*[15]

For Hanover's first motion for partial summary judgment (ECF No. 101):

    Hanover's Statement (ECF No. 115): **Han. 101 Stmt.**

    Christian Testimony's Response (ECF No. 147-1): **CT 101 Resp.**

For Hanover's second motion for summary judgment (ECF No. 116):

    Hanover's (Second Amended) Statement (ECF No. 141): **Han. 116 Stmt.**

    Christian Testimony's Response (ECF No. 146-1): **CT 116 Resp.**

    Christian Testimony's Counter-Statement (ECF No. 146-2): **CT 116 Counter.**

    Hanover's Responses to Counter-Statement (ECF Nos. 157-1, 158): **Han. 116 Resp.**

For Christian Testimony's motion for summary judgment (ECF No. 124):

    Christian Testimony's Statement (ECF No. 124-1): **CT 124 Stmt.**

    Hanover's Responses (ECF Nos. 145-1, 149, 150): **Han. 124 Resp.**

### *Moving papers:*

For Hanover's first motion for partial summary judgment (ECF No. 101):

    Hanover's Motion (ECF No. 101-3): **Han. 101 Mot.**

    Christian Testimony's Opposition (ECF No. 147): **CT 101 Opp.**

    Hanover's Reply (ECF No. 157): **Han. 101 Reply**

For Hanover's second motion for summary judgment (ECF No. 116):

    Hanover's Motion (ECF No. 116-1): **Han. 116 Mot.**

    Christian Testimony's Opposition (ECF No. 146): **CT 116 Opp.**

For Christian Testimony's motion for summary judgment (ECF No. 124):

    Christian Testimony's Motion (ECF No. 124-2): **CT 124 Mot.**

    Hanover's Opposition (as defendant on counterclaim) (ECF No. 145): **Han 124 Def. Opp.**

    Hanover's Opposition (as plaintiff on claims) (ECF No. 148): **Han 124 Pl. Opp.**

    Christian Testimony's Reply (ECF No. 154): **CT 154 Reply**

    Hanover's Sur-reply (ECF No. 161): **Han. 124 Sur-reply**

    Christian Testimony's Sur-reply (ECF No. 165): **CT 124 Sur-reply**

---

[15]    Hanover hired separate counsel to prosecute its claims and defend it against the counterclaims. Consequently, there are separate statements of material fact and moving papers on the two sets of summary judgment motions.

***Declarations, Reports, Deposition Excerpts:***

Report of Thomas V. Ashbahian, Registered Architect, attached as Exhibit 27 to the Moskin Decl. (ECF No. 128-1): **Ashbahian Report**

Declaration of James Chang, dated February 16, 2014, submitted in support of Christian Testimony's motion for summary judgment (ECF No. 125): **Chang Decl.**

Supplemental Declaration of James Chang, dated February 17, 2014, submitted in opposition to Hanover's motions for summary judgment (ECF No. 146-7): **Supp. Chang. Decl.**

Transcript of Chiming Liou's deposition on October 11, 2013, attached as Exhibit 23 to the Chang Declaration (ECF No. 128-1): **Liou Dep.**

Declaration of Chiming Liou, dated February 11, 2014, submitted in support of Hanover's first motion for summary judgment (ECF No. 101-2): **Liou Decl.**

Second Amended Declaration of Liou, dated February 18, 2014, submitted in support of Hanover's second motion for summary judgment (ECF No. 140): **2d Am. Liou Decl.**

Supplemental Declaration of Liou, dated March 15, 2014, submitted in support of Hanover's opposition to Christian Testimony's motion for summary judgment (ECF No. 145-3): **Supp. Liou Decl.**

Second Supplemental Declaration of Liou, dated March 31, 2014, submitted in support of Hanover's first motion for summary judgment (ECF No. 157-2): **2d Supp. Liou Decl.**

Third Supplemental Declaration of Liou, dated April 2, 2014, submitted in support of Hanover's opposition to Christian Testimony's motion for summary judgment (ECF No. 161-1): **3d Supp. Liou Decl.**

Declaration of Jonathan Moskin, dated February 18, 2014, submitted in support of Christian Testimony's motion for summary judgment, ECF No. 128: **Moskin Decl.**

Declaration of Wendy H. Smith, Esq., dated February 12, 2014, submitted in support of Hanover's first motion for summary judgment (ECF No. 111): **Smith Decl.**

Report of Joseph P. Tomaino, AIA PP (Consulting Architect), dated January 14, 2014, attached as Exhibit F to the Smith Decl. (ECF No. 111-1): **Tomaino Report**

Declaration of Kenneth Visbeen, dated February 25, 2014, submitted in support of Christian Testimony's ECF No. 124 motion for summary judgment (ECF No. 129): **Visbeen Decl.**

Declaration of Peter Wells, dated February 12, 2014, submitted in support of Christian Testimony's ECF No. 124 motion for summary judgment (ECF No. 127): **Wells Decl.**